## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**CHARLES C. CASE,**
       **Petitioner,**

**v.**                                    **Case No.  5:09cv39/MCR/MD**

**WALTER A. MCNEIL,**
       **Respondent.**
_____

## REPORT AND RECOMMENDATION

Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  (Doc. 1).  Respondent filed a response (doc. 16), submitting relevant portions of the state court record (doc. 21).  Petitioner filed a reply (doc. 20), which he later supplemented (doc. 22).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration of all issues raised by petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that petitioner is not entitled to relief, and that the petition is without merit and should be denied.

## BACKGROUND AND PROCEDURAL HISTORY

Petitioner was charged in separate informations filed in the Circuit Court of Jackson County, Florida, with possession of a controlled substance (methamphetamine) (Case No. 03-343) and vehicular homicide (Case No. 03-557).

(Doc. 21, Exs. A, B).[1]  The offense date for both offenses was June 20, 2003.  On July 15, 2004, the State filed a Notice to Introduce Similar Fact Evidence in the vehicular homicide case, indicating that it intended to introduce evidence of petitioner's possession and use of methamphetamine on the night of the accident.  (Ex. C).  Thereafter, the cases were consolidated.

On November 16, 2004, six days before trial, the court held a hearing on various matters.  First, the court accepted petitioenr's guilty plea to the possession charge and ajudicated him guilty of that offense.  (Ex. E, Mot. Hr'g Tr., pp. 3-9).[2]  Second, the court denied petitioner's motion to dismiss the vehicular homicide charge.[3]  (*Id.*, pp. 9-13).  Lastly, the court heard argument on petitioner's motion to suppress evidence of his drug use or possession on the night of the accident.  (*Id.*, pp. 13-19; Ex. F).  After an additional hearing three days later on the motion to suppress, the court denied relief.  (Ex. G, Mot. Hr'g Tr., pp. 37-86).

Just prior to jury selection on November 22, 2004, the court met with the prosecutor, defense counsel and petitioner in chambers.  The meeting was placed on the record.  (Ex. H, Jury Selection Tr., pp. 11-13).  During that meeting, the court inquired whether there had been a plea offer with regard to the vehicular homicide charge.  (*Id.*, p. 11).  The prosecutor responded that after one of the motion hearings the week prior, he mentioned to defense counsel that if petitioner "was inclined to plead to 7 or 8 years plus some probation," he would "speak to the victim['s family]."  (*Id.*).  The prosecutor represented that petitioner "was not receptive to that offer," and defense counsel agreed that that was correct.  (*Id.*).  Upon questioning by the trial judge, petitioner acknowledged his awareness of the proposed offer, and further

---

[1]References to exhibits are to those provided at Doc. 21, unless otherwise noted.

[2]References to page numbers of a transcript are to those appearing in the upper right-hand corner of the transcript.

[3]Petitioner sought to dismiss the charge on the grounds that the charging document was defective.

acknowledged that he had time to discuss it with defense counsel and understood that if he went to trial and was convicted of the vehicular homicide charge his sentence could be more or less than 7-8 years. (*Id.*, p. 12).

Petitioner proceeded to trial. The jury convicted him of vehicular homicide as charged, and the court sentenced him to 15 years imprisonment. (Exs. J, K, L). The court also imposed sentence for petitioner's possession of methamphetamine conviction: 5 years imprisonment to run consecutive to the 15-year sentence. (Ex. K). Petitioner's convictions and sentences were affirmed on direct appeal on May 18, 2006. *State v. Case*, 929 So.2d 1056 (Fla 1st DCA 2006) (Table) (copy at Ex. O).

On November 1, 2006, petitioner filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850, which he twice amended. (Ex. P). On March 17, 2008, the court summarily denied the amended motion without an evidentiary hearing. (Ex. P, Part II, pp. 18-22 in ECF).[4] Petitioner's motion for rehearing was denied on April 1, 2008. (*Id.*, p. 72 in ECF). The Florida First District Court of Appeal ("First DCA") affirmed the denial order without written opinion on September 5, 2008. *Case v. State*, 993 So.2d 516 (Fla. 1st DCA 2006) (Table) (copy at Ex. R). Petitioner's motion for rehearing was denied on October 28, 2008. (Ex. T).

Petitioner filed the instant federal habeas petition and supporting memorandum on February 5, 2009 (Doc. 1). Respondent concedes the petition is timely. (Doc. 16, p. 11).

## STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state

---

[4]References to page numbers "in ECF" are to the page of the identified document as it appears on the court's Case Management/Electronic Computer Filing system.

court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[5]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable

---

[5]Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); *Ramdass v. Angelone*, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  *Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by Parker v. Head*, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  *Lockyer*, 538 U.S. at 73 (quoting *Williams*, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting *Williams*, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. *Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." *Williams*, 529 U.S. at 410–12; *see also Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold").

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified

that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g. Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); *Jones v. Walker*, 496 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti v. Quarterman*, 551 U.S. 930, 127 S. Ct. 2842, 2858, 168 L.Ed.2d 662 (2007); *Jones*, *supra* (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

## PETITIONER'S GROUNDS FOR RELIEF

Petitioner raises two grounds for relief, both alleging ineffective assistance of defense counsel Guy Green. First, he contends counsel was ineffective for advising him he had a viable defense to the vehicular homicide charge and to forego

the plea offer of 7-8 years. Second, petitioner contends counsel was ineffective for advising him to forego a plea offer of 3 years probation on the possession charge, knowing petitioner had no defense to the charge and without advising petitioner of the maximum possible penalty for the charge and of the possibility that if he did not accept the plea offer he could receive consecutive sentences. As relief, petitioner seeks the following: "Grant of habeas corpus unless the State agrees to sentence Petitioner in accordance with the plea offers previously available prior to the ineffective assistance which caused rejection of those plea offers." (Doc. 1, p. 20 in ECF).

<u>Ground 1</u>   <u>Trial Counsel Was Ineffective For Advising Petitioner To Forego A Favorable Plea Offer And Proceed To Trial On An Invalid Defense Theory. (Doc. 1, pp. 5-13 in ECF)</u>

This first ground for relief relates to the petitioner's vehicular homicide conviction. Petitioner asserts defense counsel advised him that"the victim caused her own death by turning into Petitioner's right-of-way as he was passing her, and that this would constitute a legal defense to the charge of vehicular homicide by negating the element of causation." (Doc. 1, p. 5 in ECF). Petitioner states that based on this advice he rejected the proposed plea offer of 7 to 8 years, and took the case to trial. According to petitioner, at trial this theory of defense was exposed as "legally invalid" when it was revealed that "it was Petitioner who had been passing illegally, in violation of Florida Statute 316.087(1)(c), and that, consequently, when the deceased turned in Petitioner's path she was making a completely legal maneuver." (*Id.*, p. 7 in ECF). Petitioner asserts that had he "known that the avowed defense was not legally viable, he would have accepted a plea offer of 7 to 8 years." (*Id.*, p. 6 in ECF). Petitioner exhausted this issue by presenting it to the state court in his amended Rule 3.850 motion.

A.    Clearly Established Federal Law

In order to prevail upon a claim of ineffective assistance of counsel, the petitioner must prove that: (1) "counsel's representation fell below an objective

standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

"The purpose of ineffectiveness review is not to grade counsel's performance." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (citing *Strickland*). In evaluating the reasonableness of counsel's actions, a court must make "every effort . . . to eliminate the distorting effects of hindsight" and must evaluate the reasonableness of counsel's performance "from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. "Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066.

In order to meet the prejudice prong of the *Strickland* standard, petitioner must allege more than simply that the unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." 466 U.S. at 693, 104 S.Ct. at 2067. Instead, he must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694, 104 S.Ct. at 2068. When an ineffective assistance of counsel claim concerns the rejection of an offered plea agreement, the petitioner must "establish a reasonable probability that, absent counsel's alleged ineffective assistance, he would have accepted the plea agreement." *Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991) (addressing petitioner's claim that counsel was ineffective for advising him that a plea offer was unacceptable); *see also Coulter v. Herring*, 60 F.3d 1499, 1504 (11th Cir. 1995) (addressing petitioner's claim that counsel failed to advise him of the possible sentence he might face if he did not accept a plea offer and proceeded to trial, and holding that a petitioner "'must show that there is a reasonable probability that, but for counsel's errors, he would  . . . have pleaded guilty and would [not] have insisted on going to trial.'" (alteration in original)

(quoting *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985))). The petitioner's "after the fact testimony concerning his desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, he would have accepted the plea offer." *Diaz*, 930 F.2d at 835; *see also Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987) (holding that without support in the record, bare allegations that the petitioner was prejudiced by counsel's performance are not sufficient).

In applying *Strickland* the court may dispose of an ineffective assistance claim if petitioner fails to carry his burden on either of the two prongs. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999).

B.      Federal Review of State Court Decision

The state court identified correctly *Strickland* as the controlling legal standard. The trial court determined that petitioner failed to meet that standard, explaining:

> In his first allegation for Part II of his claim, the Defendant asserts that counsel provided ineffective assistance when he advised the Defendant to forgo a favorable plea offer of 7 to 8 years and to proceed to trial on a[n] invalid defense theory. Specifically, the Defendant submits that counsel's advice that he did not commit a traffic infraction when he caused the accident that resulted in the victim's death, advice Defendant claims was the product of defense counsel's supposed ignorance of a traffic statute that the Defendant actually violated while he was operating his vehicle and impaired by illegal drugs. Due to this erroneous advice, the Defendant claims that he refused the State's plea offer of 7-8 years Department of Corrections on Count One.

> Contrary to the Defendant's assertions, his claim is without merit. The Defendant has the burden of proof to establish both the ineffective assistance of the conduct in question as well as the

prejudicial impact of the conduct. However, the Defendant has made no showing that the argument advanced by his counsel at trial was in any way ineffective or improper. In fact, this Court finds that the statements attributable to counsel during trial in Defendant's motion may demonstrate counsel's ignorance of an obscure traffic law, but the conduct does not rise to the level of ineffective assistance. Instead, the Court finds that the law cited by the Defendant which conflicts with the signage and markings at the scene of the crash as argued by counsel was but one aspect of the Defendant's conduct that was scrutinized by the jury. Rather, the remaining evidence of Defendant's guilt was overwhelming, including his use of illegal drugs a short time prior to the crash, exceeding the speed limit by 16 mph in a residential area well known to him, the dark, and damp conditions of the road. Therefore, the Court finds that the Defendant has failed to establish prejudice entitling him to relief.

Despite Defendant's argument being without merit, he would have this Court believe that had he known that he had actually committed an obscure traffic infraction in addition to snorting 4 or 5 lines of methamphetamine and barreling through a residential neighborhood on dark and damp roads while in possession of a baggie containing a quantity of methamphetamine, that he would certainly have accepted the plea offer by the State. This Court finds that the Defendant's argument is inherently incredible on its face and should be denied. In support of this conclusion, this Court relies upon the Florida Supreme Court, where it has pointed out that there are "cases where, from the face of the affidavit, it can be determined that the affidavit is "inherently incredible." *See McLin v. State*, 827 So.2d 948 (Fla. 2002).

(Ex. P, Part II, p. 19 in ECF). The state appellate court affirmed this decision.

The trial transcript supports petitioner's contention that the core theory of the defense was to cast reasonable doubt on the element of causation by showing that petitioner was in a marked passing lane, that the victim violated his right-of-way by making an improper left turn into his path, and that the victim's left turn was the proximate cause of the accident. (Ex. I, Trial Tr., pp. 17-26, 330-38).[6] Petitioner

---

[6]For petitioner's opening and closing arguments, defense counsel maintained that the State could not prove petitioner was driving recklessly at the time of the accident, and further could not prove that petitioner's driving caused the victim's death. With regard to the latter counsel argued that petitioner had entered a marked passing lane to pass two slowly moving cars; that once he was in the

asserts counsel was deficient for misadvising him that this defense theory was viable when it was not. Petitioner bases his conclusion that the defense theory was "legally invalid" on the fact that the State introduced evidence that passing was prohibited on that particular stretch of the roadway because it was within 100 feet of a marked intersection.

The problem with petitioner's argument is that he has not established the defense theory was, as he describes it, "not legally viable," (doc. 1, p. 5 in ECF), "legally invalid," (*id.*, p. 6 in ECF), or "legally fictitious," (*id.*). Thus, he cannot show that counsel gave him erroneous advise or, in other words, that no competent attorney would have advised him the theory was viable.

The primary witness on the issue of causation was State's witness Ronald Cox, a traffic homicide investigator with the Florida Highway Patrol. (Ex. I, Trial Tr., pp. 212-13). He testified as an expert in the field of traffic homicide investigation and accident reconstruction. Investigator Cox surveyed the scene and spoke with other officers, emergency personnel and witnesses. Numerous photographs of the scene and the vehicles were admitted into evidence. (*Id.*, pp. 224-25). Investigator Cox determined that the right front area toward the center of petitioner's truck first made contact with the victim's car. That was the area of the truck that had sustained the most damage. The point of impact to the victim's car was the driver's door. (*Id.*, pp. 227-28). The driver's door was dented inward and had intruded into the driver's area from the force of the impact. There was 16 inches of crush damages to the victim's car and 24 inches of crush damage to petitioner's truck. (*Id.*, p. 232).

After the impact, the car and truck came to rest on the northeast corner of the intersection of Dove Lane and Rocky Creek Road. (*Id.*, p. 236). The posted speed

---

passing lane and moving parallel to the closest of the two cars, he saw the blinker of the victim's car (the front car) go on; that petitioner immediately applied his brakes and skidded; and that the victim turned into him as he was skidding. Counsel stated that once petitioner was in the passing lane he had the right-of-way over the victim who, as an inexperienced driver distracted by following her friend's vehicle, had turned across the passing lane without first ensuring it was clear.

limit for that particular stretch of roadway was 45 miles per hour. There were speed limit signs posted 1.5 miles, 1.3 miles, and 416 feet from the intersection. There was a sign warning of the intersection of Dove Lane and Rocky Creek Road 735 feet from the intersection. (*Id.*, pp. 237-38).

Over defense objection, Investigator Cox testified that it is against the law to pass another vehicle at an intersection that is marked by a warning sign at least 100 feet prior. (*Id.*, pp. 243-46). The Investigator did state, however, that the eastbound lane in which petitioner was traveling had a broken yellow center line which would indicate that passing was allowed. (*Id.*, pp. 246, 280, 304).

Investigator Cox observed furrow marks made by the vehicles sliding on the dirt and grass shoulder. (*Id.*, p. 258). There were also "skid or scuffing" type marks on the road (Dove Lane) from those furrows back to Rocky Creek Road. (*Id.*, pp. 258-59). The distance of the skid marks on the road, from the point they began until the point of collision, was 105 feet 10 inches. (*Id.*, p. 260). Using the drag sled method, Investigator Cox determined that the co-efficient of friction for the westbound lane, which was being resurfaced, was .68. (*Id.*, p. 263). If petitioner's truck had been traveling at 45 m.p.h., the truck should have been able to stop in 99 feet. (*Id.*, p. 264). Based on surface marks alone, Cox opined that petitioner's minimum rate of speed was 61 m.p.h. Based on the crush damage to petitioner's truck, Investigator Cox used a momentum formula to estimate that petitioner's minimum rate of speed would have been 65 m.p.h. Factoring in the damage to the victim's car, the estimated minimum rate of speed of petitioner's truck was 67 m.p.h. (*Id.*, pp. 264-67).

Investigator Cox measured petitioner's truck and the victim's car. He testified that based on the height of each vehicle, petitioner's bumper would have made contact between the floorboard and twelve inches above the floorboard of the victim's car. The top of petitioner's hood would have made contact above the victim's driver's side door and into the window. (*Id.*, p. 270).

Investigator Cox testified that the law required the victim to yield the right-of-way to petitioner, and that she violated his right-of-way by making an improper lane change or course (*i.e.*, the left turn into the lane occupied by petitioner's vehicle). (*Id.*, pp. 273-74). Despite this fact, it was Cox's opinion that the manner in which petitioner operated his vehicle "contributed greatly to this crash and the cause of [the victim's] death." (*Id.*, p. 274). The Investigator recommended that petitioner be charged with vehicular homicide based on the following:

A [Investigator Cox]: . . . I looked at first the fact that the speed of [petitioner's] truck was faster than the posted 45 miles an hour speed limit. The defendant had passed 3 posted 45 miles an hour signs, one was just prior, 416 feet prior to the area of collision. He also passed a warning sign for intersection. This particular warning sign designated that there was an intersecting road, Dove Lane, he failed to obey or adhere to the fact that there were posted speed limit signs and a warning sign for intersection, came into a curve. As the curve basically would be ending he comes out to pass 3 vehicles. I looked at also under the unlawful speed statute where it designates that when you have curves or approaching intersections, that you will use due care in operating your vehicle. And the fact that he was operating a vehicle at minimum 61 to as much as 67 miles an hour passing 3 vehicles and had failed to adhere to those signs, I felt that numerous violations added up to a disregard for the folks in the vehicle ahead of him and endangered their lives basically as to cause a serous injury or death.

Q [The prosecutor] Did you also consider the fact he had methamphetamine in his blood system?

A When the lab results came back with the presence of meth, yes, sir, I did.

Q What about the fact that he was familiar with that area?

A Yes, sir. Being familiar with the area and measuring the distance from the area of collision, which would be at Dove Lane to Destiny Lane [the street on which petitioner lived], with being only .3 of a mile to accelerate or to pass and be traveling at a speed faster than the speed limit of 45 and only going three more tenths of a mile down the road, yes, sir, I took that into consideration.

**Q What about the road conditions that night, Trooper, did that play any part into this?**

**A Your road conditions were damp, it had rained earlier. It was not raining at the time according and best that I can tell. I was out there and even the witnesses prior but there was dampness of the road. The fact that the road was under construction, any time you have construction and damp roads there's a statute that covers reducing your speed and driving accordingly.**

(*Id.*, pp. 275-77)

On cross examination, Investigator Cox stated that although he considered the roads damp, the actual surface on which the wheels were traveling was dry. (*Id.*, p. 278). He acknowledged that the homicide accident report he "signed off on" (prepared by a different crash investigator) listed the road as dry and the road condition as having no defect (road construction). Cox explained that he now disagreed with those assessments. (*Id.*, pp. 278-79). The report also contained a section which evaluated the "contributing causes" of the accident. Defense counsel elicited testimony from Investigator Cox that "improper passing" on petitioner's part was not considered a contributing factor:

**Q [Defense counsel] Now let's look up here, contributing causes. Number 6 the Vehicle 2, which is [the victim's], what is number 6?**

**A [Investigator Cox] It's an improper turn.**

**Q You agreed she did an improper turn, did you?**

**A I addressed that issue, yes, sir.**

**Q Now what does he give her, anything, or let me back up. As to Mr. Case, what does he contribute him to?**

**A A 12, exceeding a safe speed.**

**Q Okay. Now what is number 15?**

**A 15 is improper passing.**

**Q  Did he attribute improper passing to Mr. Case?**

**A  No, sir, he didn't show it on his crash report.**

**Q  Now Trooper, you said something a while ago that kind of shocked me because I never heard this before but there's a lot of stuff I haven't heard before.  You can't pass if there is a road sign up there or intersection?**

**A  That's correct.**

**Q  And if it's a county road or a public road; is that right?**

**A  County  maintained road if it's marked a hundred feet or before then you're not allowed to pass or not supposed to pass, that's correct.**

**Q  Okay.  Would you agree though that the dash marks saying you can pass were at that intersection?**

**A  Yes, sir, they were.**

**. . . .**

**Q  How is somebody, if it has a dashed line how is the public supposed to know that you can't pass there?**

**A  I would answer that by putting the burden on the individual operating the vehicle.  I would say that it would be up to him as he is coming down the road what he sees as to whether it would constitute a hazard or not as to make a good judgment on not passing.**

**Q  Okay.  How is an individual supposed to, if you have a line out there I thought that was safe to pass, how is an individual supposed to know that you can't pass even though it says dashed line if you got a road sign up there?**

**A  If you've got a broken line which would allow you to pass; just because it's broken doesn't mean that you can jump out and pass.  You still have to adhere to other laws and to the fact that there's an intersection and whether you can make a pass safely without having any problem when you make that pass.  You're supposed to be able to move out into the other lane, make your pass and move back in with a**

safe distance between you and the vehicle that you're passing.

(*Id*., pp. 279-82).

Investigator Cox further acknowledged that because one of the vehicles had already turned, petitioner was attempting to pass only two slowly moving vehicles. (*Id*., p. 287). Defense counsel then elicited the following information from Investigator Cox:

Q [Defense counsel]  These other people in the vehicles, the first one that turned [the car ahead of the victim's] and then the ones behind [the victim's], they were aware of Charles' [petitioner's] vehicle, were they not?

A  [Investigator Cox] Yes, sir.

Q  And in fact the young man that was in the vehicle with [the victim], he was aware of [petitioner's ] vehicle, was he not?

A  Yes, sir.

Q  And in your experience, 28 years of experience, do young drivers sometimes just don't pay attention?

A  I wouldn't limit it to just young, I think at times there's times when we all may be caught with our hand in the cookie jar.

Q  Careless?

A  Yes, sir.

Q  And from your investigation didn't you find that [the victim] was basically just kind of following the other car and did not look back and that's what caused the problem, isn't it?

A  That and if she did being that she's in a Ford with the SUV behind her with the lights on, it's possible when she looked she may have not seen the defendant coming.

Q  Well, the statute gives her that obligation to make sure it's safe for her to turn, doesn't she?

**A** As long as she don't interfere with the safe operation of the vehicles.

**Q** And she interfered with it, didn't she?

**A** Yes, sir, she interfered with him but I don't feel like he was operating safely.

(*Id.*, pp. 289-90). Later during questioning, defense counsel referred to a diagram of the crash, questioning Investigator Cox as follows:

**Q** [Defense counsel] Now, Trooper, is this the Dodge truck that Charles [petitioner] was driving?

**A** [Investigator Cox] Yes, sir.

**Q** Okay. And on this diagram right here it shows where [the victim] pulled into him?

**A** She's actually making a turn, she's at a slight angle as she's making that turn as he's impacting into her, yes, sir.

**Q** And the damage in this damage on his vehicle the primary damage was on the right front?

**A** The initial contact damage was to the right front, yes, sir.

**Q** And that's consistent with her turning right into him and hitting him on his right front side?

**A** That's consistent to what you see in the diagram.

**Q** It all matches together, doesn't it?

**A** Yes, sir.

(*Id.*, p. 294). On re-cross, defense counsel again addressed the issue of petitioner's presence in the passing lane:

**Q** [Defense counsel] Tell the jury why the State of Florida puts down those dotted yellow lines saying it is safe to pass there if it's not.

**A** [Investigator Cox] Actually you can pass as long as it's not within a hundred feet. Now as far as why they got them through the

        **intersection, Mr. Green, I can't answer that.**

(*Id.*, p. 304). At the close of the State's evidence, defense counsel moved for a directed verdict, arguing as follows:

> **MR. GREEN: On behalf of Charles Case move for directed verdict of not guilty in that the State has failed to establish a prim[a] facie case of guilty. He's charged with vehicular homicide and they have to prove that he operated a motor vehicle in a reckless manner and that it caused the death of [the victim]. In this case, Your Honor, you know, it's arguable it may have been reckless, I don't know, but in any event it did not cause her death. She violated the right-of-way, she turned in front of him. Everyone else is talking about recklessness, but the young man in her car recognized that there was a danger in the vehicle over there, the people in the car ahead of her recognized the car was there, the people behind her recognized the car was there. And it is causation and there's not a cause. It's not just contributing to it, it's the cause of this wreck. If she hadn't turned and hadn't just been careless this wreck would not have occurred.**

(*Id.*, pp. 307-08). The trial court denied the motion.

      The defense requested and was granted two special jury instructions on its theory of defense. The first related to the legality of the victim's turn. The instruction which defense counsel requested, and to which the State agreed the defense was entitled, provided:

> **No vehicle shall be driven from a direct course in any lane on any highway until the driver has determined that the vehicle is not being approached or passed by any other vehicle in the lane or on the side to which the driver desires to move and that the move can be completely made with safety and without interfering with the safe operation of any vehicle approaching from the same direction.**

(*Id.*, pp. 316-17, 360). The source of the instruction was Fla. Stat. § 316.085(2).

      The second special instruction related to the legality of petitioner's attempt to pass:

> **MR. GREEN: . . . [W]ith the court granting [the State's] requested instruction about this intersection thing, I need to do an instruction with regard to lawful to pass on a dotted line because that's what he saw out there.**

**MR. BASFORD: That would be contrary to the law, Judge.**

**MR. GREEN: I don't' think it is, it's a conflict. One statute says you can and apparently this one I never heard of says you can't.**

**THE COURT: You're both right. You can pass on dotted line but not in an intersection where there is a dotted line or not. If you [defense counsel] can come up with an instruction I'll give it because that's the state of the law.**

(*Id.*, pp. 317-18). The trial court concluded that petitioner was entitled to an instruction about the meaning of various pavement markings with regard to a driver's authority to pass, and read the following special instruction requested by the defense: "A solid line to the right of a centerline indicates no passing and a double line prohibits passing in both lanes. A dash line on your side allows for passing and a driver may go left of center to safely pass another vehicle." (*Id.*, p. 361).

The trial court could not have granted these special jury instructions had they not been both supported by the evidence and correct statements of Florida law. *Stephens v. State*, 787 So.2d 747, 756 (Fla. 2001) (holding that to be entitled to a special jury instruction, the defense must prove: "(1) the special instruction was supported by the evidence; (2) the standard instruction did not adequately cover the theory of defense; and (3) the special instruction was a correct statement of the law and not misleading or confusing.") (footnotes omitted). As the trial court in this case found when it granted both special instructions requested by the defense, there was sufficient evidence to support an instruction concerning the legality of the victim's left turn into the passing lane occupied by petitioner, and the legality of petitioner passing when there was a broken line on his side of the centerline. Indeed, during closing argument the prosecutor essentially acknowledged the legal validity of the right-of-way defense, but urged the jury to reject it: "They want to say. 'Well, she's at fault, but for her turning, no problem here, no problem whatsoever'. And the judge will read you the law about when you're making a left hand turn that if a

vehicle has got over there, you know, he's got in the passing lane, if they get there first they've got the right-of-way. I'm not disagreeing with that. I ask you though to consider the facts and the circumstances Miss Ball, Jessica Ball, was faced with that night. . . ." (*Id.*, p. 342).

In charging the jury, the court gave the following instructions pertinent to the issues petitioner raises here (the lawfulness of the victim's left turn and of his pass):

No vehicle shall be driven on the left side of the center of a roadway in overtaking and passing another vehicle proceeding in the same direction unless authorized by the provisions of this chapter and unless such left side is clearly visible and is free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be completely made without interfering with the operation of any vehicle approaching from the opposite direction of any vehicle overtaken. In every event the overtaking vehicle must return to an authorized lane of travel as soon as practicable and, in the event the passing movement involves the use of a lane authorized to vehicles approaching from the opposite direction before coming within two hundred feet of any approaching vehicle.

No vehicle shall be driven from a direct course in any lane on any highway until the driver has determined that the vehicle is not being approached or passed by any other vehicle in the lane or on the side to which the driver desires to move and that the move can be completely made with safety and without interfering with the safe operation of any vehicle approaching from the same direction.

The driver of any vehicle shall obey the instructions of any official traffic control device applicable thereto, placed in accordance with the provisions of this chapter, which is Florida law, unless otherwise directed by a police officer, subject to the exceptions granted the driver of an authority [sic] emergency vehicle in this chapter.

I shall now define an official traffic device. It includes all signs, signals, markings and devices not inconsistent with this chapter, which is Florida law, placed or erected by authority of a public body or official jurisdiction for the purpose of regulating, warning or guiding traffic.

A solid line to the right of a centerline indicates no passing and a double line prohibits passing in both lanes. A dash line on your side allows for passing and a driver may go left of center to safely pass another vehicle.

It is unlawful for a vehicle to be driven any time to the left side of the roadway when approaching within one hundred feet of or traversing any intersection on a state maintained highway or county maintained highway located outside the city limits where such intersection is marked by an official Department of Transportation or county road department traffic control device indicating an intersection either by symbol or words and such markings are placed at least one hundred feet before the intersection.

(*Id*., pp. 359-61). All of the foregoing instructions were read to the jury at the jury's request.

Although, as the state court found, there was a conflict in the law concerning whether passing was allowed on that particular portion of the roadway, that conflict did not render petitioner's causation defense "not legally viable," (doc. 1, p. 5 in ECF), "legally invalid," (*id*., p. 6 in ECF), or "legally fictitious," (*id*.). The defense could (and did) still validly argue that there was reasonable doubt concerning causation arising from evidence that the victim caused her own death by illegally turning into the passing lane already occupied by petitioner's truck without first ensuring the lane was clear.[7]

In light of the foregoing, petitioner has not established that counsel was ineffective for failing to provide accurate information necessary to evaluate the 7-8 year plea offer. He has not shown that defense counsel performed deficiently when he advised petitioner he had a viable causation defense. And, because counsel's advice in this regard was not erroneous, petitioner cannot establish he was

---

[7]Notably, in denying defense counsel's motion to arrest judgment or to grant a new trial, the trial judge went so far as to describe the case as "a very close case" on the element of causation, further commenting, "I reviewed the case law [defense counsel] provided, and the causation issue did cause me concern, but I felt with all the totality of the circumstances, that was able to be proven by the State." (Ex. K, Sentencing Hr'g Tr., p. 5).

*Case No: 5:09cv39/MCR/MD*

prejudiced by it. Furthermore, petitioner has not shown that Fla. Stat. § 316.087(1)(c) (making it unlawful to pass within 100 feet of a marked intersection) so impacted the viability of the causation defense that counsel was objectively unreasonable for failing to advise petitioner of it, and that this failure prejudiced his ability to evaluate the viability of the causation defense and the plea offer.[8] The state court's rejection of petitioner's ineffective assistance claim was neither contrary to, nor involved an objectively unreasonable application of *Strickland* and its progeny.

<u>Ground 2</u>     <u>Trial Counsel Was Ineffective For Advising Petitioner To Forego A Favorable Plea Offer When There Was No Defense Available (Doc. 1, pp. 5, 14-18 in ECF)</u>

Petitioner's second ground for relief relates to his conviction and sentence for possession of a controlled substance (methamphetamine). Petitioner entered an open plea to the charge on November 16, 2004, with no agreement as to sentence. (Ex. P, Part II, p. 25 in ECF). Petitioner now claims counsel was ineffective for misadvising him to reject an earlier plea offer of probation. As factual support for his claim, he offers the following:

> <u>On or about November-December, 2003</u>, defense counsel advised Petitioner that the state was offering a sentence of three (3) years probation on the drug possession charge in exchange for a guilty plea. However, defense counsel advised Petitioner not to accept that offer. <u>At the time counsel advised Petitioner to reject this plea offer</u> (November-December 2003), counsel failed <u>at that time</u> (November-December 2003) to advise Petitioner of the maximum penalty he faced if convicted at trial, and failed <u>at that time</u> (November-December 2003), to advise that Petitioner could possibly face a consecutive sentence for the possession should he be convicted of the vehicular homicide.

(Doc. 1, p. 14 in ECF) (emphasis in original). Petitioner further asserts that counsel knew all along petitioner had no defense to the charge as evidenced by counsel's

---

[8]Or, to state the prejudice element differently, petitioner has not established a reasonable probability that but for counsel's failure, petitioner would have evaluated the causation defense and the plea offer so differently that he would have accepted the offer and pleaded guilty to vehicular homicide

statements at the November 16, 2004 plea hearing, and that this provides further evidence that counsel performed deficiently by advising him to reject the earlier plea offer.

## A.    Clearly Established Federal Law

The clearly established Supreme Court precedent governing claims of ineffective assistance of counsel is outlined above.

## B.    Federal Review of State Court Decision

Petitioner presented this claim to the state court in his amended Rule 3.850 motion.  (Ex. P, Part I, pp. 75-80 in ECF).  He asserted essentially the same facts, <u>except</u>, he contended that the plea offer was made and rejected "[o]n or about July-August 2003."  The Rule 3.850 court denied relief as follows:

> In his Second allegation, the Defendant claims that counsel provided ineffective assistance when he advised Defendant to forgo a favorable plea offer of three years probation regarding Count Two (Possession of Methamphetamine).  Furthermore, the Defendant submits that counsel failed to advise the Defendant of the maximum penalty for the charge.  Regarding any advice to reject the plea offer, the Defendant has failed to present any evidence that such plea offer even existed, much less that he was advised to reject it.  Regardless, the Court finds that the Defendant has failed to show how the alleged advice offered by counsel was ineffective.
>
> To support his argument, the Defendant cites to *Cottle v. State*, 733 So. 2d 963 (Fla. 1999).[9]  The *Cottle* Court enumerated a three prong test, all of which must be satisfied in order for a court to find ineffective assistance based on a defendant's rejection of a plea offer.  To make a claim of ineffective assistance of counsel under *Cottle*, the Defendant must show (1) counsel failed to communicate a plea offer or misinformed the defendant concerning the penalty faced; (2) defendant would have accepted the plea offer but for the inadequate notice; and (3) acceptance of the State's plea offer would have resulted in a lesser

---

[9]*Cottle* establishes the standard for a *Strickland* analysis in the context of an ineffective assistance claim based on allegations that counsel failed to properly advise the defendant about a plea offer by the State.

sentence.

In the instant case, the Defendant admits that defense counsel informed him of the plea purportedly offered from the State, but he maintains that counsel never informed him of the maximum penalty he faced. As a result, the Defendant states that had he been informed of the maximum penalty, he would have accepted the offer. This Court finds that the defendant's claim is without merit. The record clearly indicated that the Defendant was well aware of the maximum penalty for the charge he was facing. In fact, this Court conducted a discussion with all parties present in the presence of Defendant where in he was questioned regarding his knowledge of the maximum penalty he faced. And it was explained that he was facing 15 years DOC on Count One and potentially 5 more years DOC for Count Two, with no mention of running any charges concurrently. More importantly, the prosecutor mentioned that the Defendant's total exposure for this matter was 20 years within the Department of Corrections. Thus, clearly indicating the probability to the Defendant that the charges would be run consecutively. *See Jury Record*, *Pg. 11-13*. Finally, the Court informed the Defendant directly of the maximum penalty faced (*See Hearing Record, Pg. 4*); in addition, the Court engaged in a lengthy dialogue with the Defendant in order to make abundantly clear and certain that the Defendant has been afforded not only due process, but effective assistance of counsel. (*See* Hearing Record, Pg. 4-7). Based upon the foregoing, the Court finds that the Defendant's claim shall be denied because it failed to satisfy the *Cottle* test and it is directly refuted by the record.

(Ex. P, Part II, p. 20 in ECF) (footnote added). The state appellate court affirmed without written opinion. After considering the state court record as a whole, the undersigned concludes that petitioner is not entitled to federal habeas relief on this claim. Multiple factors guide the court to this conclusion.

First, as the state court determined, petitioner's self-serving after-the-fact assertions that an offer of probation was made and that counsel advised him to reject it, are unsupported by any objective evidence in the record. Petitioner provides little detail or explanation to support his claim, and the detail he does provide undermines its validity.

For example, one of the few details petitioner provides is the time of the alleged plea offer and misadvice.  In his amended Rule 3.850 motion filed on November 16, 2007, petitioner asserted that the alleged 3-year plea offer was made and rejected "in July-August 2003." (Ex. P, Part I, p. 75 in ECF).  After the state court denied relief, petitioner filed a motion for rehearing on March 24, 2008 in which he confirmed this allegation – that "on or about July-August 2003," counsel informed petitioner of a 3-year plea offer and misadvised him to reject it.  (Ex. P, Part II, p. 58 in ECF).  On May 14, 2008, however, in his appeal to the Florida First District Court of Appeal petitioner changed his story to say that the plea offer was "made and rejected" in "December 2003," (ex. Q, pp. 29, 30 in ECF), explaining that "[a]fter further review, Appellant finds that his calculation regarding this matter was somewhat in error."  (*Id.*, p. 30 n. 12 in ECF).  Petitioner sought to diminish his "miscalculation" of this detail, arguing that it "in no way changes the substance or the validity of the claim." (Ex. Q, p. 30 n. 12 in ECF).  In this habeas court, petitioner now asserts that the plea offer was made and rejected "in November-December 2003." (Doc. 1, p. 14 in ECF).  Contrary to petitioner's argument, the timing of the alleged plea offer and misadvice <u>is</u> a factor in evaluating the validity of his claim.

The state court record establishes the following.  Petitioner's first appearance on the possession charge (Case No. 03-343) was held on June 23, 2003.  (Ex. P, Part I, p. 9 in ECF).  A formal charge was filed on July 24, 2003, and petitioner was scheduled for arraignment on August 5, 2003.  (*Id.*, *see also* Ex. B).  Petitioner's appointed counsel at that time was Russell Roberts.  (*Id.*).  Defense counsel Green did not become involved in petitioner's representation until months later, and that was in the <u>vehicular homicide</u> case.  The vehicular homicide charge was filed in a separate case, Case No. 03-557, on October 2, 2003.  (*Id.*, p. 5 in ECF; *see also* Ex. A).  Petitioner's first appearance on that charge was held on October 7, 2003, and defense counsel Green was assigned on November 4, 2003, the date of petitioner's arraignment.  (Ex. P, Part I, p. 5 in ECF).  Mr. Green's formal assignment to the

possession case was not until January 23, 2004.  (*Id*., p. 9 in ECF).[10]

Thus, petitioner's sworn contention that defense counsel Green improperly advised him with regard to a plea offer made and rejected in July-August 2003, a time when Green did not even represent him, is conclusively rebutted by the record. Compounded with the additional fact that petitioner accused counsel of failing to advise him of the potential for a consecutive sentence at a time when the vehicular homicide charge had not even been filed, even further undermines his claim. Therefore, it was not objectively unreasonable for the Rule 3.850 court to conclude that petitioner's allegations concerning a purported "July-August 2003" plea offer and counsel's improper advice were insufficient to establish a claim under *Strickland* and its progeny.

Apparently recognizing the factual impossibility of his claim, petitioner modified his allegations on appeal and here.  But even evaluating petitioner's claim as modified by his allegation that the alleged plea offer was made and rejected in "November-December 2003," he still has not established entitlement to relief.

As discussed previously, the burden of proof is on the petitioner to show both deficient performance and prejudice.  *Strickland*, 466 U.S. 687-88, 104 S.Ct. 2052; *Roberts v. Wainwright*, 666 F.2d 517, 519 n. 3 (11th Cir. 1982).  Here, even if petitioner could show that defense counsel Green began advising him in both cases once he became counsel on the vehicular homicide case in November of 2003, petitioner has not shown that he was misinformed or "misadvised" by counsel with regard to the alleged plea offer.  Petitioner's allegation of "misadvice" is grounded on his contention that counsel must have known petitioner had no defense to the possession charge based on his (counsel's) statements at the November 16, 2004 plea hearing when petitioner entered his open plea.  The following is an excerpt from

---

[10]Although the docket sheet reveals that a joint pre-trial conference in the possession and vehicular homicide cases was held on December 16, 2003, this is still several months after the alleged "July-August 2003" plea offer.

that hearing.

After defense counsel Green announced petitioner's intention to enter an open plea to the possession charge, the court made the following inquiry:

> THE COURT:  All right.  So you're pleading to one of the informations but not the other?

> MR. GREEN:  Yes, sir.

> THE COURT:  Mr. Basford, what says the State?

> MR. BASFORD:  Judge, we still intend to present evidence of that crime, we've previously given notice of similar fact evidence [on July 15, 2004].  This case was joined [on or about July 19, 2004] and we still intend to present evidence that the defendant was not only in possession of methamphetamine but that he admitted to consuming methamphetamine at anywhere from an hour, 30 minutes to an hour and 45 minutes prior to the accident.

> THE COURT:  I understand but this is a plea, he can plead straight up if he wants to do this.

> MR. BASFORD:  I can't stop him from doing that, Judge.

> (THEREUPON THE DEFENDANT WAS SWORN)

> THE COURT:  Sir, I have been handed a plea form, is this your signature on the back of the second page?

> THE DEFENDANT:  Yes, Your Honor.

> Q  Did you have a chance to go over this with Mr. Green before you signed it?

> A  Yes, Your Honor.

> Q  Are you satisfied with the services of Mr. Green as your lawyer?

> A  Yes, Your Honor.

> Q   You understand you're entering a plea to a possession of

**methamphetamine, which is a third degree felony, the maximum sentence you could receive is 5 years in state prison and/or a $5,000.[00] fine?**

**A Yes, Your Honor.**

**Q And the only agreement is I would order a presentence investigation and sentence you at a later time; is that correct?**

**A Yes, Your Honor.**

**. . . .**

**Q Now this is a little unusual, I want to ask you a couple of other questions. First of all, as I understand it we're set for trial next Monday on both of these cases, do you know that?**

**A Yes, Your Honor.**

**Q And even though you're entering a plea to possession of a controlled substance the State intends to go forward and try you on vehicular homicide, do you understand that?**

**A Yes, sir.**

**Q I'm sure Mr. Green will argue to keep it out but this may not necessarily keep out evidence of your substance abuse or use during your vehicular homicide trial; did you understand that?**

**A Yes, Your Honor.**

**Q Do you also understand that, and I'm sure you've discussed this with Mr. Green, this is a strategy, I've seen this used on other cases where someone enters a plea to one charge but not the other, do you understand that?**

**A Yes, Your Honor.**

**Q You've had sufficient time to talk to Mr. Green about this strategy?**

**A Yes, Your Honor.**

**Q  Do you understand if the jury comes back with not guilty on the vehicular homicide you still plead guilty to this and I can still sentence you to 5 years if I want to?**

**A  Yes, Your Honor.**

**Q  All right.  Mr. Green for the record and without going into the details, you have discussed this strategy with your client; is that right?**

**MR. GREEN:  Judge, you nailed it right down.**

**THE COURT:  I want to make sure you have.**

**MR. GREEN:  There's two things, and I talked to him about and I don't mind telling the court, one is that we're going to be arguing in a few minutes that the drug stuff should come out and I told him I don't know what the court's ruling is going to be.  Assuming the court rules with Mr. Basford and says the drug stuff still comes in, I think it's important, and I told him that this charge, the methamphetamine, was a small amount, four tenths of a gram, and I think important for the jury to have credibility for our side of the case and I think if you go in and say, because they found it on him, the officers asked, gave him his *Miranda* rights, he said he knew what his rights were, he admitted to it, there's no defense to it.  The strategy is I don't want to go to the jury and say, "yeah, he's not guilty of this" when obviously he is when we have a defense to the other case.**

**THE COURT:  Okay.  And Mr. Green, you know why I'm inquiring.  We often times get these 850 motion from folks in prison that say, "My lawyer didn't tell me about this strategy and I never agreed to admit anything and I wasn't guilty of it, I admitted it because I was confused."  Mr. Case, you seem alert, intelligent.  I've seen you in court several time[s], you've been in jail over a year.  I know you met with Mr. Green a lot of times, you understand and have had sufficient time to talk with him about this strategy of pleading guilty to this one charge?**

**THE DEFENDANT:  Yes, Your Honor.**

**Q  You know what you're doing?**

**A  Yes, sir.**

**(Ex. E, Mot. Hr'g Tr., pp. 3-7).**

Based on counsel's statements, petitioner argues, "[I]t clear that Petitioner had no defense whatsoever to the constructive possession charge. However, counsel had not just learned this fact. Counsel knew petitioner had no defense to this charge <u>when, and at the time</u> (a year prior), that counsel advised Petitioner to reject the state's plea offer of probation." (Doc. 1, pp. 15-16 in ECF) (emphasis in original). But to extrapolate counsel's knowledge and assessment of the possession case in November of 2003 (the inception of counsel's representation in the vehicular homicide case) solely from statements counsel made one year later about his assessment and strategy at that time (the eve of trial), is an inferential leap neither this court nor the state court can make. After all, courts must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the [challenged] conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

Petitioner's allegations and the state court record concerning counsel's knowledge, strategy and stated basis for allegedly counseling petitioner to reject the plea offer in 2003, are silent, or, at best ambiguous. As the Eleventh Circuit has explained, "an ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of effective representation. Where the record is incomplete or unclear about counsel's actions, it will be presumed that he did what he should have done, and that he exercised reasonable professional judgment." *Chandler*, 218 F.3d at 1314.

An additional factor borne out by the record is petitioner's expressed satisfaction with counsel's services when entering his open plea. On the plea form and at the plea hearing, petitioner affirmed under oath that he was satisfied with counsel's representation on the possession charge. At that time, petitioner knew

how counsel had advised him with regard to the supposed 2003 plea offer. He also knew counsel's current (November 2004) assessment of the case and stated basis for advising petitioner to enter an open plea. He also knew his sentencing exposure. Yet petitioner made no mention whatsoever of the prior more favorable plea offer. Nor did he indicate regret for having rejected it, or even a hint of discomfort, skepticism, or dissatisfaction with counsel's handling of the case. Instead, he unequivocally stated his satisfaction with counsel's services.

Petitioner's present statements about a favorable plea offer preceding his open plea and counsel's inadequate representation during the case are insufficient to rebut the "strong presumption of verity" afforded his solemn declarations on the plea form and in open court. *Blackledge v. Allison*, 431 U.S. 63, 73-74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977). Petitioner does not reconcile his self-serving statements with his declarations on the plea form and in open court that he was satisfied with counsel's advice and representation in the possession case. He fails to set forth any objective facts which would explain why he advised the plea court he was satisfied with his counsel's services.

In light of all of the foregoing, petitioner's attempt to establish deficient performance based on counsel's alleged "misadvice" to reject a 2003 plea offer is insufficient to meet the *Strickland* standard. The state court's denial of relief on this aspect of petitioner's claim was neither contrary to, nor a objectively unreasonable application of, clearly established Federal law.

The remaining aspect of petitioner's ineffective assistance claim relates to counsel's alleged omissions, at the time he communicated the plea offer, regarding petitioner's potential sentencing exposure (the possibility of a 5-year consecutive sentence). This claim can be disposed of on the prejudice prong without addressing the deficiency prong.

When challenging the rejection of a plea offer based on ineffective assistance of counsel, the defendant must show that there is a reasonable probability that, but

for counsel's error, he would have accepted the offer. *Coulter*, 60 F.3d at 1504; *Diaz*, 930 F.2d at 835. A petitioner's "after the fact testimony concerning his desire to plea, without more, is insufficient to establish" that he was prejudiced by "counsel's alleged advice or inaction." *Id. See also Cook v. United States*, 189 Fed. Appx. 927, 931 (11th Cir. 2006) (unpublished opinion) (holding that § 2255 movant's "after the fact" assertion – that but for counsel's erroneous advice regarding extent of charges against him, he would have pleaded guilty – was insufficient to show prejudice). Evidence of a petitioner's pre-conviction (or, in this case pre-open plea) desire to plead guilty provides some support for such a claim. *Diaz*, 930 F.2d at 835.

In this case therefore, petitioner must show that there is a reasonable probability that, but for counsel's failure to advise him of his sentencing exposure in November or December of 2003, he would have accepted the plea offer and pleaded guilty to the possession charge at that time. Petitioner's sole allegations with regard to prejudice are as follows:

> Petitioner entered an "open plea" to the court, without the benefit of any knowledge as to the sentence he would receive. <u>This is "objective evidence" that Petitioner would have accepted the state's plea offer of probation, had he been adequately advised</u>.

> Petitioner was sentenced to the maximum five years in prison, and that sentence was made consecutive to the fifteen year sentence Petitioner received on his conviction for vehicular homicide. <u>This is "objective evidence" that Petitioner would have accepted the state's plea offer of probation, had he been adequately advised</u>.

(Doc. 1, pp. 16-17 in ECF).[11]

Thus, petitioner does not allege that he desired to plead guilty prior to his open plea. Nor is there objective evidence of such a desire. The fact that he later

---

[11]In his supporting memorandum, petitioner repeats this allegation stating, "Petitioner ultimately entered an 'open plea' to the court, without the benefit of any knowledge as to the sentence he would receive. This, alone, constitutes "objective evidence" that Petitioner probably would have accepted the state's plea offer of probation, had he been adequately advised <u>at the time when that plea offer was made and before it was rescinded</u>." (Doc. 1, Mem. at 17 in ECF).

pleaded guilty under less favorable terms (on the eve of trial) is not evidence that he desired to plead guilty one year earlier (during the initial stages of his case) or that he would have accepted the prior offer at the time it was made. Without evidence of a reasonable probability that but for counsel's alleged omission, petitioner would have accepted the plea offer in November or December of 2003 and pleaded guilty to the possession charge, petitioner is not entitled to relief on his ineffective assistance claim. *See Diaz*, 930 F.2d at 835 ("Given appellant's awareness of the plea offer, his after the fact testimony concerning his desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, he would have accepted the plea offer. He has not established facts that, if proven, would entitle him to relief. The district court could have concluded from the record that appellant did not establish a reasonable probability that, absent counsel's alleged ineffective assistance, he would have accepted the plea agreement." (citation omitted)). Accordingly, even if this court were to find, as petitioner urges, that the state court misconstrued his claim or that it unreasonably determined that petitioner knew his sentencing exposure in December of 2003 based on the November 16, 2004 plea colloquy, he has not demonstrated his entitlement to federal habeas relief.

## PETITIONER'S REQUEST FOR AN EVIDENTIARY HEARING

In both his petition and reply, petitioner requests an evidentiary hearing. The Supreme Court has applied the following standard with regard to such requests:

> In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate. It follows that if the record refutes the application's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.

*Schriro v. Landrigan*, 550 U.S. at 474, 127 S.Ct. at 1940 (citations and footnote omitted).

This court has carefully reviewed the record in this case, and concludes that petitioner is not entitled to an evidentiary hearing.  The pertinent facts of the case are fully developed in the record before the court.  The court has been able to adequately assess petitioner's claims without further factual development.  Petitioner's request for an evidentiary hearing is therefore denied.

Accordingly, it is respectfully RECOMMENDED:

That the petition for writ of habeas corpus (doc. 1), challenging the convictions and sentences in *State of Florida v. Charles Clinton Case* in the Circuit Court of Jackson County, Florida, Case Numbers 03-557 and 03-343, be DENIED, and the clerk be directed to close the file.

At Pensacola, Florida, this 17th day of December, 2009.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).